## Adams Express Company v. Burr Oak Jersey Farm.

### (Decided November 19, 1918.)

### Appeal from Shelby Circuit Court.

1. **Carriers—Duty in Transportation of Shipment.**—A common carrier is not an insurer against delay in the transportation of the shipment, but in the absence of a specified time in the contract the delivery must be made within a reasonable time, and what constitutes a reasonable time is dependent upon the circumstances of each particular case.

2. **Carriers—Delivery of Shipment.**—If a common carrier delivers a shipment according to the usual modes employed for transportation over the route, and within the usual schedule time, a reasonable delay caused by connections necessary to be made to reach the destination can not be considered as an unreasonable delay for which the carrier is liable.

3. **Carriers—Contract With Shipper—Interstate Commerce.**—Under the Federal Statute known as the Carmack Amendment and amendatory acts thereto it is incompetent for a carrier to contract with the shipper whereby the latter obtains advantages different from the general public in the transportation of similar freight when the schedule of rates for that character of transportation is on file with the Interstate Commerce Commission.

4. **Carriers—Delivery—Injury to Stock.**—The appellant agreed to transport by express from Turner's Station in Maryland to Scotts, a station in Shelby county, Kentucky, some Jersey cattle. There was no agreement as to the time the delivery should be made, nor as to the route over which the shipment should travel, but it made close connection and reached Lexington, Kentucky, by the fast Chesapeake & Ohio train on time, without any unusual delay or injury to the cattle. That train, although passing through Scotts and over the same road, was not scheduled to stop at that place, and the cars containing the cattle were placed on a side

track in Lexington, where they were taken by the next regular train four hours later which did stop at Scotts. Held that the delivery was made within a reasonable time and the express company was not liable under a charge of negligence for causing an unreasonable delay.

MAXWELL & RAMSEY and BEARD & PICKETT for appellant.

BECKHAM & GILBERT for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On June 23, 1916, the appellant and defendant below, Adams Express Company, entered into written contracts with the plaintiff and appellee, Burr Oak Jersey Farm, whereby it agreed to transport by express from Turner's Station, a suburb of the city of Baltimore, to Scotts, a way station in Shelby county, Kentucky, four car loads of Jersey cattle, consisting of about one hundred head. The consideration agreed to be paid was $1,008.00, which was according to the regular schedule of rates for that character of freight transported in that manner between the points mentioned and which schedule was on file with the Interstate Commerce Commission.  The cattle left Turner's Station at about one o'clock in the afternoon of that day and reached the city of Washington in time to connect with and be attached to a section of the Chesapeake & Ohio fast passenger train, known as No. 5, which section left the city of Washington at about three o'clock p. m. on that same day.  It arrived in Lexington at about eleven a. m. on the morning of the 24th, when the four cars were detached from the fast Chesapeake & Ohio train and placed upon a side track in the yards at Lexington, where they remained until three o'clock that afternoon, and were then attached to a local passenger train, operated by the Louisville & Nashville Railroad Company, and taken to Scotts, the point of destination, arriving there about five-twenty-five p. m.  The point of destination is about five miles west of the city of Shelbyville, and was not a stopping point for the fast Chesapeake & Ohio train, and it was because of this fact that the shipment was detached from that train, as stated, and remained in Lexington from eleven a. m. until three p. m.  The Louisville & Nashville train which delivered the shipment to the point of destination was the first train running over that road which stopped at Scotts.

Plaintiff brought this suit claiming that it had entered into a special contract with the defendant for a through and direct transportation of the cattle, and that it had negligently failed and refused to comply therewith, and in doing so caused the four hours' delay in Lexington, resulting, as plaintiff claimed, in damage to its cattle which it placed in the petition at the sum of $1,350.00, for which it sought judgment.

The answer traversed the allegations of the petition and further relied upon a plea of *res adjudicata* which it claimed arose because of a suit which it had previously instituted against the plaintiff here in the Federal Court for the Eastern District of Kentucky to recover the freight charges, and in which it was successful. A reply, denying the allegations of that paragraph of the answer made the issue, and upon trial the jury returned a verdict in favor of plaintiff for the sum of $1,000.00, upon which judgment was rendered, and complaining of it the defendant prosecutes this appeal.

Many errors are relied upon as grounds for a reversal, among which are (1) that the court erred in submitting to the jury by a complained of instruction the issue concerning the special contract alleged in the petition, and (2) failure of the court to sustain defendant's motion for a peremptory instruction in its favor. Under the view which we take of this record we deem it unnecessary to consider any of the complaints except the two mentioned.

In regard to complaint (1) the evidence is wholly insufficient to sustain the claim of any special contract of shipment. True, there appears in the record some correspondence that took place prior to the date of the shipment, but this pertained to the procurement of cars for the transportation of the cattle, and we find nothing in the correspondence showing any agreement to enter into any contract of shipment other than the ordinary and usual one. The fact that plaintiff was endeavoring to have the cars ready to be loaded in time for the shipment to go out on that day so as to make connection with train No. 5 of the Chesapeake & Ohio at Washington (which was done) and the agreement of the defendant to have the cars ready for that purpose, present no features of a special contract, and the court was therefore in error in recognizing any such by giving the instruction objected

to.  Moreover, if the evidence had been sufficient to give color to that contention made by the plaintiff, it should have been discarded by the court because it was incompetent for the parties to make such a contract under the facts appearing in this record.  The shipment was an interstate one, and the schedule of rates, as we have stated, was on file with the Interstate Commerce Commission. Neither could the carrier nor the shipper be permitted to engage in any contract different from that open to the general public, or which imposed any additional advantages to the shipper or more extended duties on the part of the carrier.  This, under similar circumstances, has often been determined by the United States Supreme Court, as will be seen from the cases of T. & P. Ry. Co. v. Muggs, 202 U. S. 242; Bitterman v. L. & N. R. R. Co., 207 U. S. 205; Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 155; Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, 233 U. S. 173; Boston & Maine R. R. Co. v. Hooker, *idem,* 97, and Southern Ry. Co. v. Prescott, 240 U. S. 632.

The Federal Statute governing the rights of the parties under interstate shipments, like the one involved here, is the act of Congress of June 29, 1906, amending the Interstate Commerce Act of 1887, which amendatory act reads:

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

The cases from the United States Supreme Court, *supra,* in construing that act fully sustain the position taken above, and this court has followed the same inter-

pretation in the cases of L. & N. R. R. Co. v. Coquillard Wagon Works, 147 Ky. 530; L. & N. R. R. Co. v. Allen, 152 Ky., 145, and Boston v. Southern Pacific Company, 175 Ky. 641. It is therefore clear that the first complaint of appellant on this appeal is well founded, and will have to be sustained.

Considering now the (2) complaint, *supra,* the evidence discloses that both the manager of the defendant and his son accompanied the shipment. They both say, in substance, that they have no complaint of the trip from its inception to Lexington, Kentucky. On the contrary, they claim that it was "a nice trip," made "in reasonable good time," and with no rough handling; nor is there any objection found in the testimony to the character of cars furnished and into which the cattle were loaded, although complaint is made on this ground in the petition, but abandoned as the trial progressed. There is no substantial evidence of any rough handling of the cars by the Louisville & Nashville train from Lexington to Scotts, there having been a delay of only about twenty-five minutes due to stopping once for water for the engine, and another time for a short while for the passage of a freight train, none of the stock was physically injured in any manner, not even to the extent of rubbing off or ruffling up of any hair on any of them.

It is insisted, however, that some of the cattle when unloaded appeared more or less fatigued and somewhat gaunted, and that after being unloaded they laid down upon the ground, but within a reasonable time they recovered from their tired and gaunted condition. Plaintiff insists that these conditions were due to the delay of four hours in Lexington, and that it was such a delay as constituted a violation of the contract for which it is entitled to recover. It is shown that the route over which the cattle were shipped was the most direct and quickest one to Scotts. It is also shown that the Chesapeake & Ohio train hauling the shipment from Washington to Lexington was a through passenger train which did not, under its schedule, stop at Scotts. It furthermore appears that the defendant, although a common carrier, does not own any line or lines of transportation for the handling of freight which it agrees to transport, and that in so doing it uses the various railroad lines and equipment over which it does business. As a common carrier

it was the duty of the defendant to transport the cattle within a reasonable time. Its common law liability as an insurer does not include delays in shipments, it being liable when such delays occur only when they are the result of its negligence. The general rule with respect to the liability of common carriers in cases of delay is well stated in 10 C. J., on pages 283-285 in this language:

"A carrier is not an insurer against delay in the transportation of goods. The principle on which the carrier's extraordinary liability is founded does not extend to the time occupied in transporting the goods. As to the time of delivery, their liability stands on the same ground as that of ordinary bailees for hire. Hence the rule is one of general application that, in the absence of special contract binding the carrier to deliver within a specified time, mere delay in transportation does not create any liability to respond in damages. As to the diligence and care required in completing the express or implied contract for transportation only, the rule is that the carrier is bound to use reasonable diligence and care, and that only negligence will render it liable, unless a stipulated time is fixed in the contract. The shipper assumes the risk of unavoidable accidents, and of usual and ordinary delays incident to the ordinary conduct of the carrier's business. Nevertheless, if damage results from failure, without good excuse, to deliver the goods at their destination within a reasonable time, the carrier is liable for such damage; and the rule applies to shipments of live stock as well as to other classes of property or goods shipped. When a common carrier undertakes to convey goods, the law implies a contract that they shall be delivered at destination within a reasonable time, in the absence of any special agreement as to the time of delivery. This duty, it is said, is as obligatory as the duty to deliver safely. And the principle applies, although there is a written contract for the shipment which contains no stipulation as to the time within which the goods are to be delivered. The law will nevertheless imply an undertaking to carry within a reasonable time."

The same rule has been adopted in this state, as will be seen from the opinions in the cases of Southern Ry. Co. in Ky. v. Railey Bros., 26 Ky. Law Rep. 53; Louisville & Cincinnati Packet Co. v. Bottorff, 25 Ky. Law Rep. 1324 and L. & N. R. R. Co. v. Gormley, 23 Ky. Law Rep. 188.

In this case there was no stipulated time fixed in the contract for the delivery to be made, so that the principle of law contained in the authorities, *supra*, will apply—which is that the delivery should be made within a reasonable time—and when that is the rule governing the rights of the parties, as we have seen from the excerpt, *supra*, "the shipper assumes the risk of unavoidable accidents and of usual and ordinary delays incident to the ordinary conduct of the carrier's business." The "ordinary conduct of the carrier's business" in this case, as shown by the testimony, was to transport the shipment by the Chesapeake & Ohio's fast train to a point where some connecting carrier would take it with one of its trains which stopped at the point of destination. True it appears that on a previous occasion this same fast Chesapeake & Ohio train stopped at Scotts, but that is shown to have been because of a violation of the rules committed by a train dispatcher and was clearly an error on his part, it being the only time that the train ever stopped at Scotts since the Chesapeake & Ohio has been operating its trains over that line. It is quite thoroughly established that the defendant, through its agent and manager who arranged for and accompanied the shipment, knew of that universal rule and mode of transportation over that line. What constitutes a reasonable time within which a carrier should make delivery in the absence of a stipulation for a *certain* time is not susceptible of unvarying definition, but must be governed by the circumstances of each particular case. Accordingly we find the general rule upon the subject in the volume of Corpus Juris, *supra*, on pages 286-287, thus stated:

"The law does not attempt to fix by rule what is a reasonable time. What is a reasonable time is not susceptible of being defined by any general rule, but the circumstances of each particular case must be adverted to in order to determine what is a reasonable time in that case. The mode of conveyance, the distance, the seasons of the year, the character of the weather, the ordinary facilities for transportation, and an unusual rush of business, if there was such, are to be considered in determining whether in the particular case there has been an unreasonable delay. So also in determining what is a reasonable time for transportation the character of the

freight shipped is a very important consideration. It is obvious that what would be a reasonable time for the transportation of one kind of freight would not be for another kind. Accordingly some cases hold that, when the goods are perishable or peculiarly liable to injury from delay, the carrier is bound to use more expedition than where ordinary freight is being carried, and the reasonable time in such instances is a shorter period than in other cases owing to the special circumstances known to the parties at the time the undertaking was entered into. And it has been said that where the freight shipped is perishable it is the duty of the carrier to forward it by its earliest scheduled opportunity or by the earliest train it makes up in the course of its business. However, there is no absolute duty in every case to ship goods immediately on receipt of them merely because they are perishable. While they should generally be given a preference, the demands of the carrier's business, time for regular departure of trains, contracts and obligations already incurred, and other like consideration ought to be regarded in determining whether in any case the carrier has been properly diligent in forwarding the goods after the receipt thereof. In the absence of special contract or special circumstances which take the case out of the general rule the carrier is not bound to use extraordinary means to forward even perishable freight, or shipments of stock. The shipper must be understood to contemplate carriage by the regular trains on the ordinary schedule, and hence, if he desires special service, he should contract for it.''

Many cases found in the notes fully sustain the text, especially that portion of the excerpt which says ''the shipper must be understood to contemplate carriage by the regular trains on the ordinary schedule.'' It would be but a repetition unnecessarily encumbering this opinion to set out those cases here, and we content ourselves with referring to the place where they may be found.

The shipment in question is free from any delay, unless the time while in Lexington intervening between the running of the fast Chesapeake & Ohio train and the Louisville & Nashville train can be considered as negligent delay. In view of the law as we have found it there does not appear to our minds any room for doubt upon this subject. The ordinary facilities for transporta-

tion by the Express Company growing out of its not own-
ing equipment for that purpose, but employing that of
others is well known, and was known to the plaintiff in
this case. The same is true with reference to the schedule
of the fast Chesapeake & Ohio train which brought the
cattle to Lexington. Manifestly if Scotts had been locat-
ed on a different road through which no train ran from
Lexington until three o'clock p. m. on June 24, the delay
would not have been unreasonable, since the usual and
ordinary facilities for transportation would have been
employed, and it would have been carried "by the regular
trains on the ordinary schedule." The fact that the des-
tination was on the same line of road but at a place
where the train first handling it did not stop cannot, ac-
cording to our view, alter the case. It would be idle to
speculate on what might be the rights of the parties had
the Louisville & Nashville train leaving Lexington at
three o'clock failed to carry the shipment, resulting in a
greater delay at Lexington, because we have no such
facts presented. Although it is insisted that the weather
was warm, causing the cattle to suffer the damage com-
plained of by remaining in the car at Lexington, yet we
do not consider this fact sufficient under the law to affect
the rights of the parties, since, as we have seen, the ship-
ment was made by the ordinary means of transportation,
and under the usual schedule for the delivery of express
at the place of destination. It might not be amiss to
state, however, that the uncontradicted testimony showed
that the temperature at Lexington on that day was be-
ween 67 degrees and 75 degrees, according to the Govern-
ment thermometer.

We therefore conclude that there was a total failure
on the part of plaintiff to show any legal liability against
the defendant, and its motion for a peremptory instruc-
tion should have been sustained.

Wherefore, the judgment is reversed, with directions
to grant a new trial, and to proceed in accordance with
this opinion.