OLYMPIA OYSTER CO., Inc., a corporation, Plaintiff,

v.

RAYONIER INCORPORATED, a corporation, Defendant.

No. 2148.

United States District Court
W. D. Washington, S. D.
May 20, 1964.

Glenn E. Correa, Shelton, Wash., Paul Gibbs, Seattle, Wash., for plaintiff.

DeForest Perkins and Burroughs B. Anderson, Seattle, Wash., B. Frank Heuston, Shelton, Wash., for defendant.

BOLDT, District Judge.

In this action plaintiff seeks recovery of damage for the loss of oysters alleged to have been caused by water pollution resulting from the operation of defendant's pulp manufacturing plant at Shelton, Washington.[1] After extended discovery and other pretrial procedures the case came on for jury trial. At the conclusion of plaintiff's evidence defendant submitted a motion under F.R.Civ.P. 50 (a) for a directed verdict in favor of defendant. Of fifteen separate grounds advanced in support of the motion, nine attack the nature and quantum of plaintiff's evidence which defendant challenges as insufficient to support any of the several essential elements of plaintiff's claim.

It has been the practice of this court to withdraw a case from jury consideration only in those comparatively few instances in which it has appeared beyond reasonable doubt that no factual issue for jury determination was raised on the evidence presented. This is mentioned to emphasize that the challenge to the sufficiency of the proof in this case has been considered with utmost caution and with full awareness of the jury's prerogative to determine facts on conflicting testimony where there is any substantial evidence sufficient to support a verdict.

This case is one of a group of related cases to which the doctrine of primary administrative jurisdiction was held applicable in Ellison v. Rayonier, Inc., D.C., 156 F.Supp. 214 (1957). Plaintiff chose not to seek appellate review of that ruling although specifically invited to do so. Consequently the Ellison decision now must be regarded as the law of this case. Gheen v. Const. Equip. Co., 49 Wash.2d 140, 298 P.2d 852 (1956); Golden West Brewing Co. v. Milonas & Sons, Inc., 9 Cir., 104 F.2d 880 (1939).

After a considerable interval following the Ellison decision proceedings in this case were resumed by the filing of

---

1. The Shelton mill is situated on Oakland Bay at the head of Hammersley Inlet, an arm of south Puget Sound. Plaintiff's oyster beds are located on Oyster Bay near the head of Totten Inlet, another arm of Puget Sound. Hammersley Inlet and Totten Inlet are at approximately right angles to each other, the mouth of each nearly meeting on a main passage of Puget Sound. The oyster beds are about fifteen miles by water from the pulp mill. Plaintiff contends waste sulphite liquor from the mill digester was discharged into Oakland Bay and traveled through Hammersley Inlet to and through Totten Inlet and reached plaintiff's beds causing oyster mortality in large quantities. The ocean waters of Puget Sound, including both of the bays and inlets referred to, are subject to tidal cycles and currents.

amended complaints and continued over a period of more than four years during which plaintiff had ample opportunity to explore, and substantiate if the facts permitted, a claim on the basis indicated in Ellison, the concluding paragraph of which states:

"In plaintiffs' complaints there is no reference to the State Water Pollution Control Commission or any action taken by it with respect to the pollution complained of. In the absence of contrary allegations it must be assumed that defendant's plant has been operated pursuant to Commission permit from the time required; that rules, regulations and standards for such operation have been established by the Commission which are not arbitrary, capricious or unreasonable; and that defendant has not discharged effluence into the waters of the Sound in violation of the standards prescribed. If so, the alleged discharge of waste from defendant's plant was not unlawful or unreasonable as determined by the Commission, and on the present pleadings recovery for damage resulting therefrom could not be granted on the basis of either trespass or nuisance."

The permit to Rayonier for operation of the Shelton plant, issued by the State Pollution Control Commission contains fourteen conditions stated in numbered paragraphs. The six conditions claimed by plaintiff to have been violated by defendant read as follows:

"1. Sulphite waste cooking liquor solids are to be either burned or reused * * * Burner residues are to be re-burned or be disposed of in such a manner as to not affect a watercourse of the State.

"2. All leakage and overflows of sulphite waste liquor is to be prevented or eliminated including that within the mill, at the storage tanks, the waste liquor lines and the burner area.

"3. All drains from the blow pit area to the mill sewers are to be disconnected and sealed.

"4. Sulphite waste liquor produced as a result of experimental digester operations is to be collected and burned, while the mill is operating.

"5. * * * spills involving the loss of sulphite waste liquor solids are to be rapidly corrected
* * *
* * * * * *

"7. The average losses of broken fibers, and bark and cellulose fines are not to exceed 66 pounds per ton of pulp produced, and efforts are to be continuously directed towards reducing these losses even further. A settling area in the mill estuary is to be maintained in such a manner as to collect 60% or more of the suspended combustible solids contained in the mill effluent. * * * "

Condition No. 14 of the permit, not claimed by plaintiff to have been violated by defendant, provides:

"14. Failure to comply with any of the foregoing or following conditions shall be cause for revocation of the permit in the manner provided by law.

"(a). When the following factors are found to be attributable to the operations of the permitee: at the outer harbor area to the North and East of the outer Harbor line at Shelton, the dissolved oxygen concentrations are found to be less than 5 parts per million; pH range is found to be outside of 6.5 to 8.5, or when more than a negligible amount of bleached pulp fibers are found; or when a substantial depressive effect is found due to sulphite pulping wastes upon the seasonal normal densities and diversities of plankton and related forms of aquatic life. (The seasonal normal densities and diversities of such forms

are to be evaluated prior to the resumption of pulping operations).

"(b) When, at the State monitoring area near Skookum Point there is a buildup of fiber sludge deposits attributable to bleached pulp fibers; or when it is found that the permitee has added more than an average of 6 parts per million of indicated sulphite waste liquor concentrations, or has added more than a maximum of 13 parts per million of indicated sulphite waste liquor for any single sample as measured in the waters of Hammersley Inlet at the State monitoring area near Skookum Point. (Survey averages are to be based on a minimum of four sets of six samples each with each set to cross-section the channel during outgoing tides during any single day.)"

This permit must be interpreted and applied as a whole with a view of effectuating the purposes expressed in the state statute whereby the Pollution Control Commission was created. The ultimate objective of the Pollution Control Act, and of the Commission created to administer the Act, may be derived from the section of the Act which states its policy, "to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state, * * *." R.C.W. 90.48.010.

The purpose of the Rayonier permit is to provide standards and conditions specifically applicable to the operation of defendant's Shelton mill with respect of the discharge of mill wastes into Oakland Bay. The ultimate object of the permit is to prevent discharge into the waters of Puget Sound of waste materials producing quantities of potentially harmful material and conditions in excess of those specified in subparagraph 14(a) and (b) of the permit. It is clear from the very issuance of the permit and from the nature of defendant's mill operations, that discharge of some quantity and character of spent sulphite liquor (SSL) [2] into Oakland Bay is expected and authorized by the Commission and permit, provided only that the quantities and conditions specified in conditions 14(a) and (b) of the permit are not exceeded. Read thus and in the light of the statute, the permit amounts to a finding by the Pollution Control Commission as to the specific standards applicable to the discharge into Sound waters of effluence from the Shelton mill.

Under primary administrative jurisdiction principles held applicable in Ellison, plaintiff has the burden of proof to show one or more violations of the permit conditions applicable to the operation of the Shelton mill, which violation or violations produced conditions and quantities of waste effluence from the mill exceeding those specified in condition 14 of the permit. In this connection several admitted facts stated in the pretrial order are pertinent:

" * * * plaintiff does not contend that fiber accumulations occurred at or beyond Skookum Point.[3] "

"Salinity, as such, is not a substantial factor in oyster mortality."

"Material fluctuations in salinity can adversely affect condition factor of oysters."

"SSL discharged into Shelton harbor at the rate of not more than 500 gallons per week is not deleterious to native oysters in Oyster Bay."

"Plaintiff has never observed and recorded observations of the average

2. Sometimes called sulphite waste liquor (SWL)

3. A point in Hammersley Inlet some nine miles or more from plaintiff's oyster beds.

This admission, of course, completely removes from the case any question of violation of the permit conditions relating to fiber accumulations.

number of tidal cycles involved in the alleged transfer of water immediately adjacent to defendant's mill site to the waters over plaintiff's oyster beds."

"Plaintiff has never made and recorded observations in regard to its contentions as to the length of time that is required for water immediately adjacent to defendant's mill allegedly to get to the waters over plaintiff's oyster beds."

"No determination has ever been made that there occurred at plaintiff's dikes between January 1, 1954 and February 1, 1957:

(a) Dissolved oxygen concentrations less than 5 ppm;

(b) pH (hydrogen-ion concentrations) outside the range of 6.5 to 8.5;

(c) Accumulation of more than a negligible amount of bleached pulp fibers;

(d) A substantial depression in normal seasonal densities and diversities of plankton and related forms of aquatic life."

"No determination has ever been made that, at plaintiff's dikes between January 1, 1954 and February 1, 1957:

(a) Fiber sludge deposits built up substantially;

(b) Bleached pulp fibers caused the build-up, if any, referred to in the preceding statement;

(c) Defendant's mill added more than an average of 6 ppm to indicated SSL concentrations."

"The toxicity of the lignin fraction of defendant's waste, the chemical identity of which has never been scientifically identified or determined, has not been scientifically established."

"Plaintiff has not made any actual determination of the quantity, chemical identity, and concentration of chemical properties in the waters over plaintiff's oyster beds at any time."

Under the admitted facts and the evidence it is now established, without dispute or conflict, that no one at the instance of plaintiff at any time has sampled and tested water actually over and on plaintiff's oyster beds. It is now similarly established that no microscopic, as distinguished from macroscopic, full-scale scientific analysis or autopsy has ever been made for plaintiff by anyone at any time, in plaintiff's beds or elsewhere, as to the cause of death of a single oyster for which recovery is sought. Witnesses have described the growth of melosira, a marine plant, on plaintiff's oyster beds but the evidence is devoid of reference to any study or test, either of a general nature or in reference to plaintiff's beds, conducted by a qualified biologist or marine life scientist concerning melosira, its growth factors, propensities and effect, if any, upon oysters.

Most, if not all, essential fact issues in this case involve, directly or indirectly, technical matters of scientific knowledge, study and experience within the disciplines of chemistry, oceanography, zoology and biology, not to mention other scientific fields also involved but less apparent. If any reasonably fair and intelligent result is to be achieved in determination of plaintiff's claims, evidence of scientific studies is required which relates directly and specifically, if not exclusively, to the specific fact issues upon which findings by verdict in this particular case might reasonably be reached. Evidence meeting minimal scientific standards and relating directly and particularly to plaintiff's oyster beds could and should have been developed and offered by plaintiff. Evidence of sampling and testing meeting scientific standards should have been presented regarding: the condition factors in plaintiff's oyster beds during the claimed loss period; the content and quality of effluence discharged from defendant's Shelton mill; the content and movement

of waters in Oakland Bay and Oyster Bay; and the water currents between the two bays. To meet scientific standards, such sampling and testing should have included a sufficient quantity of samples so selected as to have been reasonably and fairly representative of the entire quantity to which the derived data was to be applied. Substantial justice is not possible in this case unless the fact issues involving scientific questions be presented to the jury on evidence meeting or reasonably approximating scientific standards.

Plaintiff has fallen far short of submitting evidence of the character referred to. Plaintiff's contentions and most of the opinions and estimates expressed by the witnesses are not supported by reasonably substantiated and recorded basic data as to any single one of the issues involving scientific questions. In some instances witnesses have not shown minimal qualifications for their opinion testimony in various scientific fields. If plaintiff's claims have merit, there has been ample opportunity, time and means for plaintiff to have thoroughly explored, developed and prepared substantial evidence meeting or reasonably approaching scientific requirements on the scientific issues. No reason is shown why scientific studies carefully and objectively made on the basis of reasonably authenticated data could not or should not have been procured and presented in evidence.

In many tort cases direct and specific studies and tests as to essential facts are not possible, or if so, only to a limited extent. An unexpected casualty, such as a traffic accident, explosion, or the like, resulting in personal injury or property damage, usually occurs suddenly and under conditions which prevent investigation of the circumstances until a time when direct evidence of the controlling facts is not available and reasonable inferences from the available evidence are difficult to make. It is not so as to the claim now on trial. Plaintiff's manager testified to early knowledge of the oyster mortality for which damages now are claimed, and assertion of the claim now on trial was contemplated during the mortality period and considerably before the original complaint was filed in May, 1957.

Good faith, as well as legal sufficiency, required reasonably satisfactory scientific investigation of the nature, extent, and cause of the claimed mortalities and damage. The admitted facts recited, others not specifically quoted, and the evidence offered shows no investigation of such a character has ever been made by or on behalf of plaintiff. Considering that vital public interests of the people of this state are involved in the subject matter and that it is of great significance to several important industries of this state, including both oyster cultivation and pulp production among others, it seems clear that a jury should not be required to consider and determine the fact issues largely, if not entirely, on speculation and conjecture and by cumulative piling of inference upon inference.

▬ Under long-established Washington law, controlling in this diversity case, substantial evidence is required, and a mere scintilla of proof on a vital issue is not sufficient to take a case to a jury. Charlton v. Baker, 61 Wash.2d 369, 378 P.2d 432 (1963). Also, well-settled Washington law requires expert scientific evidence to show proximate causation when it is dependent on scientific evaluation, Hill v. Great Northern Life Ins. Co., 186 Wash. 167, 57 P.2d 405 (1936), and the evidence must be sufficient to permit a jury to reasonably determine whether or not it is probable that the alleged injury was caused by the conduct complained of. Anton v. Chicago, M. & St. P. R. Co., 92 Wash. 305, 159 P. 115 (1916); Glazer v. Adams, 64 Wash.2d 161, 391 P.2d 195 (1964). In such cases, testimony as to causation amounting only to a possibility or, to quote an expert witness in this case, "possibly a probability", is not sufficient as a matter of law. Miller v. Staton, 58 Wash.2d 879, 365 P.2d 333 (1961); Bland v. King County, 55 Wash.2d 902, 342 P.2d 599, 351 P.2d 153 (1959).

██ Washington law demands that verdicts rest upon substantial evidence and not upon conjecture and speculation by witnesses or jury.

"The facts relied upon to establish a theory by circumstantial evidence must be of such a nature and so related to each other that it is the only conclusion that fairly or reasonably can be drawn from them. A verdict cannot be founded on mere theory or speculation. If there is nothing more tangible to proceed upon than two or more equally reasonable inferences from a set of facts, and under only one of the inferences would the defendant be liable, a jury will not be allowed to resort to conjecture to determine the facts. Mason v. Turner, 48 Wash.2d 145, 291 P.2d 1023 (1956); Arnold v. Sanstol, 43 Wash.2d 94, 260 P.2d 327 (1953); Gardner v. Seymour, 27 Wash.2d 802, 180 P.2d 564 (1947); and cases cited therein. * * *" Schmidt v. Pioneer United Dairies, 60 Wash.2d 271, 373 P.2d 764 (1962).

Beyond reasonable doubt, on the evidence presented a verdict for plaintiff in any amount would have to rest on speculation and conjecture as to several, if not all, of the essential issues. Plaintiff has not presented substantial evidence from which the jury reasonably might infer: (1) that violations of the defendant's permit resulted in discharge of SSL into state waters in amounts producing water conditions violative of permit limitations; or (2) that SSL in any amount or in any quantities harmful to oysters actually reached defendant's beds in Oyster Bay; or (3) that proximate causal relationship existed between SSL discharged at the Shelton mill and oyster mortality on plaintiff's beds in Oyster Bay; or (4) that damage in amounts ascertainable other than by pure speculation was suffered by plaintiff due to water pollution attributable to the defendant in whole or in part.

██ As to damages, it is a well known rule that more substantial and specific evidence is required to establish liability than is necessary in proof of the amount of damages to be awarded. Larson v. Union Investment & Loan Co., 168 Wash. 5, 10 P.2d 557 (1932); Gilmartin v. Stevens Inv. Co., 43 Wash.2d 289, 261 P.2d 73, 266 P.2d 800 (1953). Once liability for damages is established, the precise amount need not be shown with mathematical certainty. Nevertheless, every plaintiff claiming damages has the burden of proof to present sufficient evidence from which damages can be determined on some rational basis and other than by pure speculation and conjecture. Gilmartin v. Stevens Inv. Co., supra. Under the evidence in this case it would be utterly impossible for a jury to arrive at a determination either of the fact or the amount of damages, except solely by guesswork. The evidence concerning damages is so vague, uncertain and speculative as to amount to a complete failure of proof as to damages, even within the liberal limits the law permits.

Language approved by the Washington Supreme Court in Knight v. Trogdon Truck Co., 191 Wash. 646, 71 P.2d 1003 (1937), which in principle frequently has been expressed in one wording or another by that court, is especially applicable to the evidence presented by plaintiff in this case: " '[T]he credulity of courts is not to be deemed commensurate with the facility and vehemence with which a witness swears. "It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude its judgment." ' "

██ For the reasons stated, it must be held that the evidence presented is insufficient to take the case to the jury. The motion for directed verdict in favor of defendant is granted and the action is dismissed on the merits, with prejudice, and with costs to defendant. It is so ordered.