**ASSOCIATION OF MARYLAND PILOTS**

v.

**The BALTIMORE AND OHIO RAIL-ROAD COMPANY.**

Civ. No. 17648.

United States District Court
D. Maryland.

Oct. 8, 1969.

J. Cookman Boyd, Jr., Stanford D. Hess, and Sauerwein, Boyd & Decker, Baltimore, Md., for plaintiff.

Michael P. Crocker, and Piper & Marbury, Baltimore, Md., for defendant.

HARVEY, District Judge:

In this action brought under the Interstate Commerce Act, a shipper is seeking to recover from a common carrier by rail for loss and damage to a shipment of parts of a marine engine allegedly sustained during a trip from Slidell, Louisiana, to Baltimore, Maryland. The shipment was originally delivered to a carrier of the Southern Railway System in Louisiana,[1] but when it eventually arrived in Maryland, it had passed over lines of the Southern Railway Company ("the Southern Railway") and of the Baltimore and Ohio Railroad Company ("the B & O"), which has been named as the defendant in this action. Under 49 U.S.C. § 20(11), the so-called Carmack Amendment, suit may be brought against the delivering carrier by a shipper suffering loss which occurs during an interstate shipment.

The plaintiff is an organization known as The Association of Maryland Pilots ("the Pilots"). It is an unincorporated association which has been accorded statutory recognition by Maryland law. See Article 74 of the Annotated Code of Maryland (1967 Repl.Vol.). § 10 of Article 74 requires that all vessels engaged in foreign trade to and from any port within the State must take a licensed State pilot. Under § 19, as many as three pilot boats may be required to be kept at sea for furnishing pilots for vessels entering the Chesapeake Bay. One of these boats currently ·maintained by the Pilots is the BALTIMORE. In order to provide replacement parts for the two old Winton diesel engines which propel the BALTIMORE, the Pilots had in 1965 purchased for $8500 another old Winton engine located in Slidell, Louisiana. This engine was dismantled, and various parts were loaded on a single Southern Railway flat car and shipped to Baltimore to be stored at the Maryland Shipbuilding and Drydock Company ("Maryland Drydock") and used as replacements when needed.[2]

---

1. The Bill of Lading was issued by the New Orleans and Northeastern Railroad Company, a part of the Southern Railway System.

2. The parts shipped included a cylinder block, a crankshaft, a camshaft, a thrustblock, 7 pistons, 9 cylinder heads, and various valves, bearings and other mis-

During the interstate trip, a derailment occurred near Trabor, South Carolina, with the result that 36 cars of the 2-mile long train left the track. The flat car on which these engine parts were located was the first of these cars to be derailed.[3] Following the derailment, the Southern Railway transferred the Pilots' shipment from the flar car to a gondola car which eventually arrived in Baltimore more than a month after the derailment had occurred. When the engine parts were unloaded by representatives of Maryland Drydock, allegedly some were missing, others were damaged and many parts were covered with rust, mud, dirt and other foreign matter. In its complaint, the Pilots originally sought judgment in the amount of $135,667. However, at the trial, counsel conceded that the plaintiff's maximum recovery could be no more than $73,899.

The B & O contends that it is not liable because any loss or damage sustained by the plaintiff was caused by its own negligence in loading the shipment. The B & O further maintains that even if the carrier were found liable, the shipper has not sustained its burden of proving that it suffered any damages at all, or if the fact of damages be found to have been proved, the amount should be limited to the market value of the goods themselves.

The case has been tried by the Court without a jury. This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in this opinion, whether or not expressly so characterized.

### Liability

Two questions arise with reference to the issue of liability presented in this case: (1) whether the derailment was caused by the negligent act of the shipper in loading the goods, and (2) whether, if the accident was caused by negligent loading, the derailment was in fact the cause of the loss and damage to the engine parts.

### (1) Negligence

A shipper makes out a prima facie case of negligence against a carrier when it is shown that goods were delivered to a carrier in good condition and that the carrier delivered them to the consignee in a damaged condition. Missouri Pac. R. R. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); Chesapeake & Ohio Ry. v. Thompson Mfg. Co., 270 U.S. 416, 422–423, 46 S.Ct. 318, 70 L.Ed. 659 (1926); Atlantic Coast Line R. R. v. Georgia Packing Co., 164 F.2d 1, 3 (5th Cir. 1947). However, the carrier is ordinarily not liable for acts or defaults of the shipper in loading a car in an improper manner. South Carolina Asparagus Growers' Ass'n v. Southern Ry., 46 F.2d 452, 454 (4th Cir. 1931); United States v. Savage Truck Line, Inc., 209 F.2d 442, 445, 44 A.L.R.2d 984 (4th Cir. 1953), cert. den. 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954); Modern Tool Corp. v. Pennsylvania R. R., 100 F.Supp. 595, 597 (D.N.J.1951). Section 1(b) of the Bill of Lading covering this shipment specifically so provided.

It is not disputed in this case that an agent of the Pilots loaded the flat car which had been provided by the Southern Railway for the trip. What is in issue here is whether one of the parts comprising the shipment was so negligently secured to the flat car by such agent that it fell off during the interstate trip, causing the derailment.

The Winton marine engine which the Pilots purchased in Louisiana came from a tug originally built in 1929. In 1964, the tug owner, DeBardeleben Marine Corporation of New Orleans, had removed this engine from the tug and left it in an open field belonging to the

---

cellaneous items. The evidence indicates that the purchase was made primarily to secure the nine cylinder heads, although the other items would also be of some use as spare parts.

3. In spite of the derailment, the flat car had remained in an upright position, and substantially all the engine parts had remained in place as originally shipped.

Southern Shipbuilding Company near Slidell, Louisiana. A New York Marine broker purchased this engine from De-Bardeleben early in 1965 and in turn sold it to the Pilots pursuant to a Bill of Sale dated August 23, 1965.

Robert Wood, a marine consultant residing in New Orleans, was employed by the Pilots to make arrangements for shipping to Maryland the parts of the engine needed as possible replacements for the BALTIMORE's engines. Wood engaged on behalf of the Pilots a New Orleans firm known as Power Engineering, Inc. ("Power Engineering") [4] to undertake the dismantling, cleaning and loading of the engine parts. This work was under the direction of the firm's President, Herman Oosterhuis. Following dismantling of the DeBardeleben engine, various parts were steam-cleaned and covered with preservative. A railroad car was ordered from the Southern Railway for use in shipping the parts selected to Maryland, and in the latter part of September, 1965 a flat car, No. 117672, was delivered to Power Engineering at the premises of the Southern Shipbuilding Company. Under Oosterhuis's direction, both large and small parts of the DeBardeleben engine were loaded onto the Southern Railway flat car. Left behind as not being usable for the Pilots' purposes were the crankcase, flywheel and certain other parts.

The flat car left Louisiana on October 6, 1965. On October 13, at approximately 6:30 A.M., a derailment occurred near Trabor, South Carolina, as the train was heading in a northerly direction. Inspection by the Conductor, Alfred W. Mann, Jr., who was in the caboose at the time of the derailment, disclosed that the flat car loaded by Oosterhuis was the first of 36 cars to the South derailed or overturned. This particular car was found to be upright and still coupled to a box car to the immediate north, but its rear wheels were off the rails. The remaining eighty-three cars to the north and the six locomotives had remained on the rails.

Three-tenths of a mile south of car No. 117672, Mann observed continuous wheel marks on the cross ties. He further came upon an oblong piece of machinery located six feet from the west rail in the area of the derailed cars. This piece of machinery was observed near a switch where the single line track from the south branched into a double line. From the point at which wheel marks indicated. that the derailment had started back to a spot adjacent to where the cylinder head was found, irregular gouged-out marks appeared on the ties between the rails. The cut lever [5] located at the coupling point between the front end of the flat car and the box car immediately ahead was bent downward and contained freshly-made gouge marks and abrasions upon its metal. One of the nine cylinder heads on the flat car was missing. Mann further noticed that there was a newly skinned place or marking on the journal or axle running between the front wheels of the flat car. This axle lay just beneath the space that had been occupied by the missing cylinder head and just back of the coupling space where the bent and marked cut lever was located. According to Mann, the train had been going down grade to the point of derailment.

■ In view of these facts, this Court finds that the derailment occurred when a heavy marine engine part which had been loaded on flat car No. 117672 slid forward and fell off the front edge of the car. The piece in question was one of the nine cylinder heads which were included in the shipment. It came loose as the train was proceeding down a slight grade, slid forward over the front edge of the car and dropped to the bed of the road. After falling off the flat car, the cylinder head came in contact with the rear wheels of the car, causing the wheels to leave the track and further causing derailment of the 35 cars that followed.

---

4. The firm's name was later changed to Power Marine Engineering.

5. The function of a cut lever is to separate the cars.

The evidence further shows that the flat car in question was negligently loaded by the plaintiff's agent. Herman Oosterhuis, President of Power Engineering, was a native of Holland who had been in the United States for about two years at the time of the loading operation. At his deposition, he admitted that he had had no experience in the loading of railroad freight and in fact had never loaded a railroad car before. In loading the car in question, the engine block and crank shaft had been strapped down by metal bands stretched across the flat car and welded to its frame. However, the nine cylinder heads, which weighed approximately a ton and a half each, were merely laid on the front end of the car and surrounded by framework of one inch by ten inch planks. No metal straps were used to secure the cylinder heads, and the wooden framework was not braced by stakes at the front end of the car. Smaller engine parts were placed in the spaces left around the cylinder heads. Even without reference to the A.R.A. Loading Rules [6], it is clear that the cylinder heads were not properly and securely fastened to the floor of the flat car so as to withstand the vibrations and jolting of a long trip. Specific reference to the Rules themselves further supports a finding of negligence on the part of the shipper's agent.[7]

The Pilots seek to shift responsibility for the negligent loading to the carrier because of brief visual inspections of the load by railroad employees made before the train left and at other intervals during the trip. An opaque plastic cover was placed over the engine parts after they were loaded, but it is not entirely clear from the evidence whether a representative of the railroad saw the loaded car before or after the cover was in place. In any event, the facts here indicate that the cursory inspections that occurred in Louisiana and at various other points along the way did not relieve the shipper of liability for the negligent loading. The loading defects which caused the derailment could not have been discovered by an ordinary visual inspection, even in the absence of a plastic cover. A carrier cannot be held liable for the act of the shipper in loading a car improperly without evidence that the defect was patent and apparent by ordinary observation. Minneapolis, St. Paul & Sault Ste. Marie R. R. v. Metal-Matic, Inc., 323 F.2d 903 (8th Cir. 1963); Emerson Elec. Mfg. Co. v. Terminal Ry. Ass'n, 262 S.W.2d 323 (Mo. App.1953). Even if a local agent of the carrier were to have knowledge of the negligent loading, responsibility for such negligence is not thereby transferred to the carrier. As the Fourth Circuit Court of Appeals said in South Carolina Asparagus Growers' Ass'n v. Southern Ry., supra, 46 F.2d at pages 454–455:

"And as the bill of lading was in a form and upon a rate approved by the Interstate Commerce Commission, no agent of a carrrier could have been authorized to vary its terms for the advantage of a shipper by undertaking additional responsibility on behalf of the carrier. Chicago & Alton R. Co. v. Kirby, 225 U.S. 155, 165, 32 S.Ct. 648, 56 L.Ed. 1033. Ann.Cas.1914A, 501; Adams Express Co. v. Burr Oak Jersey Farm, 182 Ky. 116, 206 S.W. 173. Mere knowledge on the part of the local agent of the carrier of the negligent manner in which the shipment had been packed could not impose liability for this negligence on the carrier, where the shipper itself had expressly undertaken the packing and the injury sustained was due to negligence in this regard and not to any negligence on the part of the carrier."

---

6. The Association of American Railroads has adopted detailed rules for the loading of commodities on open top cars. The Bill of Lading required shippers to observe carriers' rules regulating the safe loading of freight and the protection of equipment.

7. In particular, it is clear that Oosterhuis did not comply with Rules 1 and 5 of the General Rules.

### (2) Causation

The finding here that negligence attributable to the Pilots caused the derailment does not end the matter. The evidence further indicates that the loss and damage suffered by the shipper were not occasioned by the derailment.[8] Following the derailment, substantially the entire shipment was in place on the flat car except for the one cylinder head that caused the accident and possibly a few minor parts. Eight colored photographs of the flat car which were taken immediately after the derailment by a claims agent of the Southern Railway show that with these exceptions the shipment was substantially undisturbed.

The derailment occurred on October 13, 1965. However, the engine parts did not arrive in Baltimore until November 15, 1965, and then they had been placed in a gondola car. During that entire period, the parts were in the exclusive possession and control of either the Southern Railway or the B & O. A common carrier's liability does not cease until delivery of the shipment to the consignee. See Republic Carloading & Distributing Co. v. Missouri Pac. R. R., 302 F.2d 381, 386 (8th Cir. 1962). But the record is strangely silent as to what happened during and after the transfer of the shipment from the flat car to the gondola car. The manner in which the engine parts were removed from the flat car and placed in the gondola has not been explained, nor have adequate details been furnished concerning any attempt to secure the shipment in the gondola. Furthermore, no evidence whatsoever has been introduced by the B & O to explain why there was such a long delay in the arrival of the shipment or where the shipment was located during the 1-month period that it remained in the carrier's possession after the derailment. Attempts by the Pilots to ascertain these facts by means of discovery have been unsuccessful.

It is clear from the evidence, however, that when these parts arrived in Baltimore more than a month after the derailment they were in a damaged and dirty condition. Parts had apparently been hastily dumped in the gondola car with no provision having been made for skidding or crating. A witness who had supervised the unloading testified that it appeared that the engine parts had been loaded into the gondola by means of a magnet. Photographs taken after unloading at Maryland Drydock show that three studs on the top of the cylinder block and five or six studs on the side of the block were bent when the block arrived in Baltimore, although there was clearly no such damage shown by the photographs taken immediately after the derailment. Whether or not damage to the studs themselves was substantial, this photographic evidence supports the findings of the survey of December 2–3, 1965 to the effect that various engine parts were damaged in transit.

This Court finds then that in spite of the derailment, the shipment, except for the one missing cylinder head and a few other minor parts, was undamaged and in the possession of the carrier on October 13, 1965, but that upon delivery on November 15, 1965 the shipment was in a damaged and dirty condition. The shipper has thereby made out a prima facie case of negligence and the burden is upon the carrier to prove that it was not negligent. Missouri Pac. Ry. v. Elmore & Stahl, *supra*. This burden has not been met by the B & O, which is therefore liable to the Pilots for damage and other loss to this shipment.

The B & O must bear responsibility even for the cylinder head which fell off the flat car and which now is missing. After the derailment, this cylinder head was observed alongside the track by a railroad employee, but it was never thereafter picked up and delivered to the Pilots. The evidence clearly indicates that 9 cylinder heads were shipped from Louisiana but only 8 were delivered in Baltimore. The B & O argues that this head must necessarily have been

---

8. The loss of and possible damage to the one cylinder head that fell is discussed hereinafter.

damaged severely and that it was presumably worthless after the accident. But actual evidence to such effect has not been adduced. Although the Pilots were responsible for the derailment, the carrier had a duty to mitigate damages resulting from the negligent act of the shipper's agent, including a duty to deliver the cylinder head in its possession to the Pilots. See 13 C.J.S. Carriers § 83, pages 166–167. In the absence of any proof showing that the head was in fact severely damaged and in the further absence of proof showing facts which might excuse the carrier for failing to deliver this one item, the B & O must be held accountable for the loss of this cylinder head as well as for the damage to the rest of the shipment.

## Damages

In claiming damages in the amount of $73,899, the Pilots rely on the survey report made in December of 1965 and on a written proposal submitted by Maryland Drydock on July 7, 1966 for cleaning and repairing the engine parts which the surveyors found to be damaged and for replacing those which the surveyors found to be missing. The survey was conducted at Maryland Drydock premises on December 2 and 3, 1965, after the parts had been unloaded from the gondola car. Three men participated in the survey, Francis J. Eilers, representing Aetna Insurance Company, Robert Wood, representing the Pilots, and T. E. Kimsey, representing the Southern Railway. Mr. Kimsey refused to sign the final report. Some months later, R. F. Lamcke, Maryland Drydocks Manager of Estimating, reviewed the survey report and submitted his proposal estimating the cost of the repairs and replacements for items stated to be damaged or missing.

It appears that there are deficiencies in the survey report, in particular in those portions which indicate that various engine parts were missing. The inventory list of parts shipped, which was forwarded by Power Engineering after the derailment, was not nearly as detailed as the list contained in the survey report and contained no breakdown of the parts into components as did the survey. As the survey was accomplished by a visual inspection made after the parts had already been unloaded, there was no way for the surveyors to know precisely what parts of the Slidell engine had been shipped as they had no detailed shipping list to use for comparison.[9] In fact, Wood testified that he had no written inventory but checked the parts against his recollection of what had been shipped. From all the evidence in the case, this Court finds that except for the one cylinder head that caused the derailment and possibly a few minor parts of little value, substantially all of the parts of the Slidell engine shipped in October from Louisiana did in fact arrive in Maryland in November.

Although the survey report contains deficiencies as to items allegedly lost, this Court finds such report to be essentially accurate in detailing damage to the shipment that occurred between October 13, 1965, when substantially all of the parts were in place on the flat car after the derailment, and November 15, 1965, when the shipment finally arrived in Baltimore in a gondola car. The manner in which the parts had been dumped into the gondola car for the balance of the trip after the derailment supports the survey's finding of damage. There were nicks and gouges in some parts; others were bent and twisted, and some minor parts were broken. Most of the smaller parts had been cleaned and covered with preservative before they left

9. Furthermore, the surveyors had undertaken their work under the misapprehension, as set forth in the heading of the report, that the engine parts had been received at Maryland Drydock "subsequent to derailment and upsetting of cargo" from the flat car. Their apparent assumption that the entire shipment was "upset" may well have led them to the conclusion that a number of parts did not actually arrive.

Louisiana, but upon arrival in Baltimore were found to be dirty and rusted. Under such circumstances, this Court is satisfied that the survey report and the accompanying estimate are sufficient proof to establish that the cost of cleaning and repairing the dirty and damaged engine parts that did arrive and the cost of replacing the cylinder head would exceed the fair value of the property before the loss occurred.

■ The cost of repairs and replacements is not necessarily the proper measure of damages where injury to property has been sustained. It is firmly established that damages claimed as repairs or replacements may not exceed the fair value of the property before the injury, unless it can be shown that the property has some special value to the owner greater than its value to others. The Nyland, 164 F.Supp. 741, 744 (D.Md. 1958); O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502, 505–506 (2d Cir. 1947); Gass v. Agate Ice Cream, Inc., 264 N.Y. 141, 143, 190 N.E. 323 (1934). The Pilots argue that the property here had no market or exchange value but in fact had a peculiar value to their organization which was in excess of the estimated cost of repairs and replacements. See Restatement of Torts, § 911, Comment (e). It must first be determined then whether the property here did in fact have a market or exchange value.

In early 1965, Edward R. Paterson, a New York marine broker, purchased the Slidell engine from DeBardeleben Marine Corporation for $2500. Before that transaction, the engine had been advertised for sale by DeBardeleben in the *Waterways Journal*, a national weekly publication serving the maritime industry. Jack Frost, a marine consultant, recommended to the Pilots that they purchase this engine from Paterson to provide replacement parts for the BALTIMORE.

In a letter dated July 26, 1965, Frost suggested to the Pilots that they "move quickly" as the owners of another vessel, the former WILLIAMSBURG, were also "in the market for these parts." In addition, the New York Pilots Association, which maintained a pilot boat similar to the BALTIMORE, was also in the market for spare parts, as were the owners of another similar vessel, the CRYSTAL, which had even borrowed a cylinder head from the plaintiff several years earlier. Paterson originally asked $11,500 for the engine. Following negotiations between Paterson and Lynch, the Pilots' Treasurer, a price of $8500 was finally agreed upon, and the sale was concluded on August 23, 1965.

Although claiming here that the engine parts had a special value greatly in excess of the purchase price, the Pilots took out insurance for the shipment of the parts to Baltimore in the amount of only $12,-000. This figure was reached by adding the crating and rail freight costs to the $8500 purchase price. From minutes of a meeting of the Pilots' Board held on November 4, 1965, it appears that the Board had then been informed that the derailment had occurred and that any resulting damage or loss suffered by the engine parts was covered by insurance.

In view of these facts, this Court concludes that the Slidell engine did in fact have a market or exchange value at the time of the loss and that such value was the $8500 price for which the engine had been purchased several months before. With several boat owners interested in acquiring these parts as replacements at about the same time, this property was not of a type which because of its uniqueness had no market value. The evidence clearly shows that the price eventually agreed upon was a negotiated one reached as the result of arms-length bargaining between the parties.[10]

---

10. This finding that there was a market value for the engine parts in question has been made without reference to the statement made by counsel for the B & O indicating the immediate availability of two additional cylinder heads for a Winton marine engine. This statement was made in open court on May 26, 1969 near the end of the trial and was supplemented by a letter dated June 2, 1969 from the attorney for the B & O to the Pilots' attorney offering to deliver these

Moreover, the plaintiff has not met its burden of proving that this property had a special and greater value which exceeded the market value of the property itself. It is, of course, true that once liability has been established, the precise amount of the damages to be awarded need not be shown with mathematical certainty. McCormick, Damages, § 27. Nevertheless, every plaintiff claiming damages has the burden of proof to present sufficient evidence from which damages can be determined on some rational basis and other than by pure speculation and conjecture. Olympia Oyster Co. v. Rayonier Inc., 229 F.Supp. 855 (W.D. Wash.1964); Maicobo Investment Corp. v. Von Der Heide, 243 F.Supp. 885 (D. Md.1965); McCormick, Damages, § 25.

This Court is satisfied that the plaintiff here has proved the fact of damage and further that there is sufficient proof in the record of the market or exchange value of the property damaged or lost. But the plaintiff has not proved with sufficient certainty that the special value to it of the engine parts in question exceeded such market value and that therefore the market or exchange value should be disregarded as the proper measure of damages. The evidence relied upon by the plaintiff in seeking to prove that the property had a special or peculiar value is so uncertain and speculative that the plaintiff has not satisfied its burden in this respect.

The pilot boat BALTIMORE was approaching the end of its useful life in December of 1965. Originally built as a private yacht for Alfred P. Sloan in 1929, it had been used in many different ways during the intervening forty years until the time of trial. In World War II, it had been a weather ship, and thereafter it had been used by the Alaska Steamship Company. In 1949, the Pilots acquired the BALTIMORE and by the time of trial it had been in continuous service in the Chesapeake Bay, except for annual lay-ups for inspection, for a period of some 20 years.

At the request of the Pilots, the firm of M. Rosenblatt & Son, Inc., naval architects, inspected the BALTIMORE in May of 1964 and submitted a report on the existing condition of the vessel. This survey indicated that the condition of the boat's hull was such that ten years of additional service beyond the date of the survey could be expected if maintenance recommendations were followed.[11] By the time of the trial in May of 1969, five of those ten years had elapsed.

Furthermore, the Slidell engine itself was nearly 40 years old. It had been continuously operated in a tug until 1964 and, after removal, had remained unprotected and out in the open for over a year when it was purchased by the Pilots. It was not surprising then that these used parts showed signs of wear resulting from heavy use.

In addition to the engine parts purchased in Louisiana, the Pilots had on hand in 1965 a quantity of other parts for use as possible replacements for the BALTIMORE engines, including at least two other spare cylinder heads. In the three and a half years from the date of the derailment until the trial, few re-

---

cylinder heads to the Pilots without prejudice to defendant's legal position in order "to resolve any doubt or dispute * * * about any cylinder head not delivered or any delivered in an allegedly damaged condition * * *." According to the B & O's attorney, these heads had been purchased pursuant to a Bill of Sale dated April 25, 1969 and had been a part of the unused spare parts inventory for the ANTON BRUN, which was formerly the presidential yacht WILLIAMSBURG. As no legally sufficient

evidence supporting these statements is contained in the record, this Court's findings are not based in any way on any such representations contained in statements or correspondence of counsel.

11. In January of 1964, the Pilots' Treasurer had contacted another naval architect concerning the possibility of building a new pilot boat and had expressed the hope at that time that the BALTIMORE would "give us another four to five years of service."

placements have been needed.[12] Two cylinder heads and a number of exhaust valves have been replaced during that period, and the testimony indicates that the cylinder heads removed can be repaired for reuse by a simple welding process. The need for the Slidell engine parts has not been shown to be so urgent and immediate that the BALTIMORE would have to discontinue its normal operations in their absence.

It is axiomatic that a plaintiff should not benefit by his loss. Gass v. Agate Ice Cream, Inc., supra, 264 N.Y. at 143, 190 N.E. 323. But were damages to be awarded here in the claimed amount of $73,899, it is more likely than not that the Pilots would be the beneficiary of a substantial windfall. It is pure conjecture to suggest that these second hand parts for a vessel nearing the end of its useful life have a special value to the Pilots in excess of their market value of $8500, particularly since other parts were already available as replacements when the loss was sustained. This Court has found that these parts did have a market value of $8500 and that repairs and replacements in excess of this latter figure have been proved. Such repairs and replacements would be required to provide a reasonably adequate supply of parts and to insure the continued operation of the BALTIMORE for the balance of its useful life. However, damages exceeding the market value of property may not be awarded absent a showing of special value to the owner. The Nyland, supra.

■■■■■■ The weakness of the Pilots' position is pointed up by the chronology of events. In July of 1965, the Pilots purchased this used engine for $8500. In October of 1965, the parts shipped from Louisiana were insured for $12,000. Yet several months later, in December of the same year, usable portions of this same engine are claimed by the Pilots to be worth in excess of $73,899. This Court concludes that the Pilots have failed to prove the special value claimed.[13]

■■■■ The B & O asserts that any judgment against it based on the market value of the Slidell engine should be reduced by $1250, which is claimed to be the scrap value of the parts left in Louisiana. That unusable parts of the Slidell engine were not shipped to Baltimore is clear. However, the B & O has not proved to the satisfaction of this Court the amount of such claimed deduction. The B & O relies on minutes of a meeting of the Pilots' Board held on August 4, 1965. But these minutes indicated merely that the Pilots hoped to be able to sell as scrap unusable parts of the Slidell engine at a price of $50.00 per ton. There is no evidence in the record that such a sale was ever consummated, nor has evidence been produced showing the exact weight of the parts not shipped or the market value per ton of these parts in the absence of a sale. In the absence of such proof, the B & O is not entitled to the reduction it claims in the damages herein awarded.

For the reasons stated, judgment is hereby entered in favor of the plaintiff in the amount of $8500 plus costs. Counsel will prepare and submit an appropriate order providing for the award of any interest that may be due.

12. A later report made by the Rosenblatt firm found the two main engines to be in good condition on May 26, 1967.

13. In view of this Court's determination as to the proper amount of damages to be awarded, it is not necessary to consider the B & O's further contention that the Pilots are prohibited from claiming that the property had extraordinary value by Section 5 of the Bill of Lading which provides, inter alia, that no carrier will be liable for articles of extraordinary value not specifically rated in the published classifications or tariffs unless a special agreement to do so exists. It is clear from the authorities that a carrier cannot by contract exempt itself from liability imposed under 49 U.S.C. § 20 (11). Caten v. Salt City Movers' & Storage Co., 149 F.2d 428, 432 (2d Cir. 1945); Thomas Electronics, Inc. v. H. W. Taynton Co., 277 F.Supp. 639, 642 (M.D.Pa.1967). Whether such a clause may limit the amount of damages that may be recovered for a loss is a question that need not be decided here.